USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______________
DATE FILED: JUL 10 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PAUL REMBERT,

Plaintiff,

-v-

KEVIN CHEVERKO, COMMISSIONER OF THE WESTCHESTER COUNTY DEPARTMENT OF CORRECTIONS, et al.,

Defendants.

12-cv-9196 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

On December 17, 2012, pro se plaintiff Paul Rembert commenced this action under 42 U.S.C. § 1983 for violations of his First, Eighth, and Fourteenth Amendment rights while he was incarcerated in the Westchester County Department of Corrections ("WCDOC").

The operative complaint, the Second Amended Complaint ("SAC"),[1] asserts § 1983 claims against two sets of defendants: (1) WCDOC, WCDOC Commissioner Kevin Cheverko, and WCDOC correction officers Ross Magnuson, Michael Randazzo, Joseph Delgado, Sergeant Luis Salterelli, and Captain John Gleason (collectively, the "WCDOC Defendants");[2] and (2) WCDOC medical provider Correct

[1] Plaintiff previously filed a First Amended Complaint with leave of the Court on August 27, 2013. (ECF Nos. 22-26.) Plaintiff filed the SAC (ECF No. 38) on October 28, 2013 following defendants' responses to the Court's September 19, 2013 Valentin Order. (ECF Nos. 30, 36-37.)

[2] Though the SAC also refers to two unidentified WCDOC correction officers (SAC ¶¶ 12, 15), counsel to WCDOC was unable to identify these individuals based on the information provided by plaintiff. (ECF No. 37.) In an Order dated December 5, 2013, and in response to further inquiry by plaintiff (ECF No. 41), the Court stated that plaintiff had failed to provide any additional information concerning these individuals, and that "WCDOC has satisfactorily complied with the Court's

Care Solutions, LLC ("CCS"), and CCS employees Marcella King-Bogle and Michael Kelly (collectively, the "CCS Defendants").[3] (See SAC ¶¶ 4-11, 13-14.)

On January 17, 2014, the CCS Defendants moved to dismiss the SAC pursuant to Rule 12(b)(6); plaintiff opposed the motion on February 24, 2014, and the motion became fully briefed on March 6, 2014. (ECF Nos. 48-50, 72, 78.) Following service on the remaining WCDOC Defendants (see ECF Nos. 51, 54, 69, 71, 73-75, 79-83, 88), on April 16, 2014, the WCDOC Defendants also moved to dismiss the SAC pursuant to Rule 12(b)(6). (ECF No. 85-87.) Plaintiff opposed the motion on June 2, 2014, and the motion became fully briefed on June 23, 2014. (ECF Nos. 96, 99.)

For the reasons set forth below, the WCDOC Defendants' motion to dismiss is GRANTED and the CCS Defendants' motion to dismiss is GRANTED in part and DENIED in part.

## I. FACTS

### A. February 2012 Incidents with Inmate Bridle

On February 27, 2012, plaintiff, then a WCDOC pre-trial detainee, alleges that he was working in the law library assisting inmates with legal research and the copying of forms. (See SAC ¶¶ 3, 23-24.) Plaintiff alleges that another inmate in the law library, Trevor Bridle, began to make copies in violation of posted signs

---

September 19, 2013 [Valentin] order." (ECF No. 42.) In any event, even if WCDOC had been able to determine the identities of these other correction officers and plaintiff had named them in the SAC, these defendants would still be subject to dismissal for the reasons set forth herein respecting the WCDOC Defendants.

[3] By Order dated March 6, 2014, the Court dismissed plaintiff's claims against another doctor, Dr. Richard McGill, in light of plaintiff's February 27, 2014 letter stating that plaintiff wished to withdraw his claims against Dr. McGill. (ECF Nos. 76, 77.)

restricting such activities. (Id. ¶ 25.) According to plaintiff, Bridle stated, "I'm making some damn copies on this machine and you had better not try to stop me because I'll beat your old ass." (Id.) Plaintiff alleges that Bridle was a "convicted violent sex offender there for violation of his parole." (Id.)

As Bridle began to make copies, plaintiff alleges that he left the law library to report Bridle's behavior to defendant Magnuson, and reported to Magnuson that he did not feel safe because Bridle was making threats toward him and operating the copy machine on his own. (Id.) Plaintiff alleges that Magnuson then entered the law library and spoke with Bridle, but took no further action. (Id.) According to plaintiff, no correction officers were in the law library either before Magnuson entered or after she left, though the library was monitored by video surveillance. (See id.; Rembert-WCDOC Opp. at 16, ECF No. 96.)

The next day, February 28, 2012, plaintiff alleges that he was again working in the law library when Bridle entered the room. (SAC ¶ 26.) Again, according to plaintiff, there were no correction officers in the library that day, although the library was monitored by video surveillance. (See id. ¶¶ 27-28; Rembert-WCDOC Opp. at 16.) Soon after Bridle entered the library, plaintiff alleges that Bridle engaged him in a heated verbal exchange in which Bridle threatened to break the copy machine and called plaintiff a "two-faced person and a rat." (SAC ¶ 26.) Plaintiff responded to Bridle: "are you talking to me?"; Bridle then got out of his seat and approached plaintiff. (Id.) Plaintiff also got out of his seat, but another inmate initially restrained Bridle. (Id.) After plaintiff and Bridle returned to their

seats, Bridle again stood up and attacked plaintiff. (Id.) Plaintiff alleges that Bridle punched him in the head and eye, and that during the ensuing scuffle Bridle bit plaintiff and plaintiff felt a sharp pain in his left wrist when he fell to the floor. (Id.) Plaintiff alleges that Bridle punched plaintiff in the back of the head multiple times while he was on the floor, to the point where plaintiff became dizzy and nearly unconscious. (Id.)

After Bridle first punched plaintiff, plaintiff alleges that another inmate ran out of the library and told defendant Randazzo about the incident. (Id.) Plaintiff alleges that Randazzo eventually entered the law library and pulled Bridle off of plaintiff. (Id.) An emergency response team then arrived, placed plaintiff and Bridle in handcuffs, and took them to receive medical treatment. (Id.) At the clinic, plaintiff alleges that he told defendant King-Bogle, a CCS nurse, about the nature of his injuries—punches and bites—and that he had pain in his left wrist and shoulder. (Id. ¶ 28.) Plaintiff alleges that he received an injection in his shoulder for the bites, and bandages for the injuries to his eye and other lacerations. (Id.)

The same day, plaintiff completed a statement form describing the events of February 27 and 28, 2012. (Id. ¶ 30, Ex. D.) On the form, plaintiff indicated that he would like to "press charges" against Bridle. (Id. ¶ 30, Ex. D.) "Days later,"[4] plaintiff alleges that he filled out a grievance form regarding Magnuson's failure to protect plaintiff from Bridle, but "never received anything back on it." (Id. ¶ 17.) On March 2, 2012, plaintiff attempted to file a second grievance, "this time against

[4] According to plaintiff, he was unable to fill out a grievance form on February 28, 2012, the day of the assault, because defendant Delgado informed plaintiff that they had run out of the applicable forms. (Id. ¶ 17.)

the facility for placing Trevor Bridle . . . into population with other inmates who have lower security classifications." (Id. ¶ 18.) According to plaintiff, "a Sergeant" refused to accept and file the March 2 grievance "by saying that he don't accept grievances after the matter has been resolved, meaning that inmate Bridle was moved out of population the same day of the assault." (Id.)

B. Subsequent Medical Treatment

In the months that followed, plaintiff filled out multiple sick call slips and complained to CCS medical staff of ear, jaw, head, and wrist pain. (Id. ¶¶ 31-34.) At first, plaintiff alleges that he complained of headaches and wrist pain, but was told by CCS nurses that they could not give plaintiff any medicine for either ailment. (Id. ¶ 31.) During one visit to the clinic, plaintiff alleges that a CCS nurse, after examining plaintiff's ear and jaw, told him that there was nothing wrong with his ear and that he was "just a big baby." (Id. ¶ 32.) During another visit, plaintiff alleges he complained of blurry eyesight and bad headaches; plaintiff alleges that the CCS medical staff tested his eyesight and informed him that he needed glasses, but did not give him any medication. (Id. ¶ 33.)

Plaintiff alleges that his wrist also caused him significant pain during this time period. (See id. ¶¶ 34, 36.) During another visit to the clinic, plaintiff alleges that he showed a CCS nurse his wrist, which was swollen and immobile; the nurse then ordered an X-Ray "some time in the month of August [2012]." (Id. ¶ 34.) Plaintiff alleges that an X-Ray was subsequently taken of his wrist "[a]fter some time," which showed a fracture. (Id. ¶ 35.) Plaintiff alleges that the CCS medical

staff prescribed him Tylenol for the pain, and he was ordered to see an orthopedic specialist. (Id.) Subsequently, plaintiff alleges that CCS nurses changed his pain medication on three occasions during additional trips to the clinic; plaintiff alleges that some of these medications "did slightly ease the pain," though he continued to have some difficulty sleeping. (Id. ¶¶ 36-38.)

On October 23, 2012, plaintiff alleges that he submitted a third grievance, this time "against the jail and medical staff for delaying to have plaintiff seen by the Orthopedic Specialist," which plaintiff alleges he gave to defendant Salterelli. (Id. ¶¶ 19, 36, Ex. A.) Plaintiff alleges that, when Salterelli returned the grievance form to him, the second page of the form (which would have provided plaintiff with an opportunity to appeal the denial of his grievance) was missing. (Id. ¶ 19, Ex. A.)

In November 2012, plaintiff alleges that he saw an orthopedic specialist, who ordered surgery for plaintiff's wrist in plaintiff's presence. (Id. ¶ 36.) Despite that order, plaintiff alleges that defendant Kelly, CCS Director of Nursing, ordered one session of physical therapy. (See id. ¶¶ 14, 40, 51; Rembert-CCS Opp. at 5-6, ECF No. 72.) Plaintiff alleges that Kelly ordered physical therapy instead of surgery "to justify the delay of surgery" and "to avoid the cost of surgery . . . until plaintiff was transferred to a state prison." (SAC ¶¶ 40, 51.)

On December 17, 2012,[5] plaintiff filed his fourth grievance "against the jail and medical staff because of the delay of time it was taking to have the required surgery." (Id. ¶ 39, Ex. B.) The response to the grievance, dated December 19,

[5] The Court notes that this is also the date that plaintiff's original complaint in this action was received for filing; the complaint itself bears the date December 10, 2012. (ECF No. 2.)

2012, states that an orthopedic specialist "recommended surgery but did not order it," and that "the CCS Medical Director . . . generated an Outpatient Referral for the procedure." (Id. Ex. B at 2.) Plaintiff alleges that he did not receive this response to the grievance until Friday, December 28, 2012, and that the correction officer who returned it to him prevented him from appealing. (Id. ¶ 39.) Plaintiff alleges that this officer told him, in a "very intimidating manner," that it was "not a good idea to appeal" and to "leave it alone because you're leaving soon." (Id.) On Monday, December 31, 2012, plaintiff was transferred from WCDOC to the New York State Department of Corrections, where he has since been incarcerated. (See id. ¶¶ 3, 39; ECF Nos. 8, 9.)

Plaintiff alleges that he has sustained permanent damage to his wrist, including the loss of mobility. (Id. ¶ 51.)

C. Events Following Transfer from WCDOC

After his transfer, plaintiff alleges that he requested copies of the grievances he filed from WCDOC. (Id. ¶ 20.) On July 25, 2013, plaintiff received copies of his October 23, 2012 and December 17, 2012 grievances. (Id. ¶ 20, Ex. C.) Plaintiff alleges that the copy of the December 17 grievance that he received had his signature on the second page, thereby waiving his right to appeal, but plaintiff denies signing the December 17 grievance. (Id. ¶ 20, Ex. C.) Plaintiff alleges defendant Gleason forged plaintiff's signature on the July 25, 2013 copy of the December 17 grievance. (Id. ¶ 21.)

II. STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in plaintiff's favor, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." Id.

"[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers . . . ." Estelle v. Gamble, 429 U.S. 97, 106 (1976) (citations and internal quotation marks omitted). Accordingly, the Court "liberally construe[s] pleadings and briefs submitted by pro se litigants . . . reading such submissions to raise the strongest arguments they suggest." Bertin v. United States, 478 F.3d 489, 491 (2d Cir. 2007). However, even a pro se complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678; see Fuentes v. Tilles, 376 F. App'x 91, 92 (2d. Cir. 2010) (affirming district court's dismissal of pro se complaint for failure to state a claim).

On a motion to dismiss, a court may properly consider documents that have been attached as exhibits to the complaint as well as documents that have been

incorporated by reference. Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007). Documents are incorporated by reference when the complaint "relies heavily upon its terms and effect" such that it is "integral" to the pleadings. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted) (quoting Int'l Audiotext Network, Inc. v. AT&T Co., 62 F.3d 69, 72 (2d Cir. 1995)).

III. DISCUSSION

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

Construed liberally, the SAC alleges four sets of § 1983 claims: (A) failure to protect by the WCDOC Defendants, in violation of the Fourteenth Amendment;[6] (B) deliberate indifference to plaintiff's medical needs by the CCS Defendants, in violation of the Fourteenth Amendment; (C) retaliation by the WCDOC Defendants for filing grievances against prison officials, in violation of the First and Fourteenth Amendments; and (D) municipal liability by Westchester County[7] and CCS[8] for

[6] The Court construes plaintiff's failure to protect and deliberate indifference claims as brought under the Due Process Clause of the Fourteenth Amendment because plaintiff is a state pretrial detainee. See Caiozzo v. Koreman, 581 F.3d 63, 69 (2d Cir. 2009). The applicable standard for these claims, however, is identical to that applicable to a claim brought by a convicted inmate under the Eighth Amendment. Id. at 72 ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment.").

[7] The Court construes plaintiff's claims against WCDOC as against Westchester County, because WCDOC is not a suable entity. See, e.g., Johnson v. Westchester Cnty. Dep't of Corr. Med. Dep't, No. 10 Civ. 6309 (JGK), 2011 WL 2946168, at *3 n.4 (S.D.N.Y. July 19, 2011); Jones, 557 F. Supp. 2d at 416 n.4. But see Linden v. Westchester Cnty., No. 93 Civ. 8373 (MBM), 1995 WL 686742, at *1 (S.D.N.Y. Nov. 20, 1995).

[8] CCS, a private entity that provides medical services to WCDOC inmates, is a suable entity in this action because it is a state actor for purposes of a § 1983 claim. See Rojas v. Alexander's Dep't

these alleged constitutional violations. (See SAC ¶¶ 48-51.) Plaintiff seeks compensatory damages in an amount not less than $300,000.[9] (Id. ¶ 52.)

For the reasons that follow,[10] plaintiff fails to adequately plead any § 1983 claims against the WCDOC Defendants or King-Bogle but has adequately pleaded a § 1983 claim based on Fourteenth Amendment deliberate indifference by CCS Defendant Kelly for the medical treatment plaintiff received after it was determined that he had a fractured wrist.

A. Failure to Protect

Plaintiff alleges that WCDOC Defendants Magnuson, Randazzo, Cheverko, and an unidentified "Supervisor of Security Classification" violated his Fourteenth Amendment rights by failing to protect plaintiff from Bridle. (See SAC ¶¶ 6-7, 15, 25-26, 41-43, 45, 50; Rembert-WCDOC Opp. at 9-11.) These claims fail.

Prison officials are constitutionally required to "take reasonable measures to guarantee the safety of the inmates," in particular, "to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 832, 833 (1994) (internal quotation marks and citations omitted). A prison official

---

Stores, 924 F.2d 406, 408-09 (2d Cir. 1990) ("Private employers are not liable under § 1983 for the constitutional torts of their employees, unless the plaintiff proves that 'action pursuant to official . . . policy of some nature caused a constitutional tort.'") (citing Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978)) (other citations omitted); Bess v. City of New York, No. 11 Civ. 7604 (TPG), 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013) ("In providing medical care in prisons, [private entity] performs a role traditionally within the exclusive prerogative of the state and therefore, in this context, is the functional equivalent of the municipality.") (citing cases).

[9] Plaintiff has withdrawn his request for punitive damages. (See Rembert-WCDOC Opp. at 16.)

[10] Because plaintiff alleges, in substance, that certain WCDOC Defendants prevented him from filing or otherwise pursuing certain grievances (see SAC ¶¶ 17-21), the Court declines to dismiss the SAC on the basis of failure to exhaust administrative remedies under the Prison Litigation Reform Act because this affirmative defense does not appear on the face of the complaint. See Jones v. Bock, 549 U.S. 199, 215-16 (2007). Because the WCDOC Defendants are otherwise dismissed from this action, the Court also need not reach the issue of whether they are entitled to qualified immunity.

violates this requirement when (a) the inmate is incarcerated "under conditions posing a substantial risk of serious harm;" and (b) the prison official showed "deliberate indifference to inmate health or safety." Id. at 834 (citations omitted). "[A] prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer, 511 U.S. at 837). "[M]ere negligence will not suffice." Hayes, 84 F.3d at 620.

Plaintiff alleges that defendant Magnuson was deliberately indifferent "by failing to protect him from a prison attack [by Bridle] even after she had been informed of the threat to plaintiff's health and safety" and "by failing to write a misbehavior report for Bridle's refusal to obey a direct order when he operated the copy machine." (SAC ¶ 41.) Even assuming the conditions in the law library (video surveillance but no correction officers) posed a substantial risk of serious harm, plaintiff does not allege any facts tending to show sufficient culpable intent by Magnuson. To the contrary, the SAC alleges that, on February 27, 2012, Magnuson immediately responded to plaintiff's complaint by speaking with Bridle. (See id. ¶ 27.) The SAC does not allege that Bridle failed to respond to Magnuson's orders on February 27, 2012, or that any other incidents involving the two inmates took place that day.

Similarly, plaintiff alleges that defendant Randazzo was deliberately indifferent, on February 28, 2012, because he failed to protect plaintiff from Bridle's

attack even after being informed of the conflict by another inmate. (See id. ¶ 42.) Again, however, plaintiff does not allege any facts that tend to show Randazzo knew plaintiff faced a substantial risk of serious harm and disregarded that risk. To the contrary, the SAC alleges Randazzo entered the law library "at some point in time" after being informed of the altercation and pulled Bridle off of plaintiff. (See id. ¶ 26.) Plaintiff also alleges that, following the arrival of an emergency response team, he was immediately taken to receive medical treatment. (See id. ¶ 27.) The SAC does not allege that Randazzo knew of any history of animosity between the two inmates, or that such a history existed beyond the limited interaction the prior day.

At most, plaintiff alleges that Magnuson and Randazzo acted negligently in failing to appropriately weigh a risk to plaintiff's health that resulted in a relatively spontaneous fight.[11] Such allegations, however, are insufficient to assert a constitutional violation for failure to protect. See Davidson v. Cannon, 474 U.S. 344, 347-48 (1986) (holding Fourteenth Amendment did not "guarantee due care" on the part of state officials who "mistakenly believed that the situation [involving a threat to an inmate] was not particularly serious" and then "simply forgot [about the threat]"); Parris v. N.Y. State Dep't of Corr. Servs., 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013) (holding correction officers who "left certain security posts unmanned and failed to notice the ongoing assault for several minutes" did not act with deliberate indifference because, inter alia, plaintiff acknowledged officers "did

[11] The Court notes that, according to the SAC, plaintiff also contributed to the escalation of the conflict between he and Bridle on February 28, 2012. (See id. ¶ 26.)

not notice the incident for several minutes"). Accordingly, plaintiff's Fourteenth Amendment claims for failure to protect against Magnuson and Randazzo fail.

The SAC's only allegation as to defendant Cheverko is that he "exercised deliberate indifference to plaintiff's health and safety by failing to protect him from a violent attack even though he had been informed of a threat . . . ." (SAC ¶ 45.) This assertion—that Cheverko was informed of a "threat" by Bridle to plaintiff, after the February 27, 2012 incident but before the February 28, 2012 incident—is wholly conclusory and must be rejected for the purposes of this motion. See Iqbal, 556 U.S. at 678. The mere fact that plaintiff reported his concerns about Bridle to Magnuson on February 27, 2012 (see Rembert-WCDOC Opp. at 14) is insufficient to support liability as to Cheverko; "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003).

Finally, plaintiff alleges that an unidentified "Supervisor of Security Classification" was deliberately indifferent because he "failed to properly classify inmate Bridle"; because "Bridle is a convicted violent sex offender," plaintiff alleges Bridle should not have been placed in "a low security population with minimal supervision." (SAC ¶ 43.) This allegation—in substance, second-guessing a prison administrative decision—is not only devoid of facts giving rise to an inference of the required culpable intent, but also runs contrary to the principle that federal courts must accord considerable deference to these kinds of decisions by state prisons. See Turner v. Safley, 482 U.S. 78, 84-85 (1987); see also Rigano v. Cnty. of Sullivan, 486

F. Supp. 2d 244, 255-56 (S.D.N.Y. 2007) (holding corrections officers who did not discover potential risk to inmate before other inmates attacked him not deliberately indifferent). As a result, even if this unnamed "Supervisor" had been identified and served, this § 1983 claim would also fail.

B. Deliberate Indifference to Medical Needs

Plaintiff next alleges that CCS Defendants King-Bogle and Kelly, as well as other CCS personnel generally, violated his Fourteenth Amendment rights by depriving plaintiff of adequate medical care. (See SAC ¶ 51; Rembert-CCS Opp. at 1-3.) To the extent this claim is for medical care plaintiff received prior to the determination that he had a fractured wrist, it fails. To the extent this claim is for medical care plaintiff received after this determination, it does not fail as a matter of law at the pleading stage. Accordingly, the CCS Defendants' motion to dismiss this claim is GRANTED in part and DENIED in part.

To succeed on a § 1983 claim for deprivation of medical care, a plaintiff must allege that a defendant undertook "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000). As discussed in the prior section, the deliberate indifference standard includes both subjective and objective components. See Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011).

1. Subjective component

To fulfill the subjective component, "the official charged with deliberate indifference must act with a 'sufficiently culpable state of mind.' That is, the official must 'know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Id. (alterations omitted) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991) and Farmer, 511 U.S. at 837).

Liberally construed, the SAC alleges defendant King-Bogle acted with deliberate indifference by dismissing plaintiff's complaints of wrist pain and failing to order an X-Ray with sufficient haste. (See SAC ¶¶ 32, 46-47, 51.) Plaintiff also alleges that King-Bogle, as well as the CCS nursing and medical staff more generally, were deliberately indifferent because they failed to prescribe proper pain medication. (See id. ¶¶ 36-38; Rembert-CCS Opp. at 1-3.)

Far from alleging that King-Bogle or other CCS personnel deliberately disregarded a substantial risk to his health, however, the SAC is replete with allegations that plaintiff received continuous treatment from King-Bogle and CCS during the ten months between the February 28, 2012 attack and his transfer out of WCDOC at the end of the year. Plaintiff alleges he received medical treatment the day of the attack, and that he returned to CCS multiple times in the months that followed; plaintiff alleges he received different treatments and pain medications as

his symptoms (including those related to his wrist) progressed.[12] (See id. ¶¶ 27-38.) Plaintiff also concedes that an X-Ray of his wrist was ultimately ordered in August 2012 and taken soon thereafter, following a period during which plaintiff alleges the pain in his wrist was progressively getting worse. (See id. ¶¶ 31-35.) Where, as here, a plaintiff's complaints reflect mere disagreement with the course of treatment he receives, a plaintiff fails to adequately allege deliberate indifference. See Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.").

Plaintiff does, however, adequately allege deliberate indifference by defendant Kelly for the treatment he received after an X-Ray showed that his wrist had been fractured. Liberally construed, plaintiff alleges that, for four months, he received only pain medication and physical therapy for his fractured wrist and, even after a doctor determined that surgery was necessary, Kelly ordered physical therapy in order to delay surgery until after plaintiff was transferred out of WCDOC to avoid the associated costs. (See SAC ¶¶ 40, 47, 51; Rembert-CCS Opp. at 5.) Though certain aspects of the timeline of plaintiff's treatment and the severity of plaintiff's injuries are unclear to the Court—e.g., when plaintiff's X-Ray was taken (it is alleged to have been "ordered" in August 2012), the nature of the fracture, the orthopedic specialist actual recommendation, and the cause of the various delays in treatment—it is precisely this lack of clarity that leads the Court to deny this aspect of the CCS Defendants' motion to dismiss this pro se complaint.

---

[12] In fact, plaintiff concedes that at least one of the pain medications he was prescribed "did slightly ease the pain" in his wrist. (Id. ¶ 37.)

The SAC's allegations, which the Court accepts as true, paint a disturbing picture of the treatment plaintiff received for his fractured wrist, and are sufficient to state a § 1983 claim for deliberate indifference. See Chance, 143 F.3d at 703 (quoting Williams v. Vincent, 508 F.2d 541, 544 (2d Cir. 1974)) ("[A] physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan."); Jones, 557 F. Supp. 2d at 414 ("Defendants denied [plaintiff] this surgery for the sole—and manifestly improper—reason that they wished to shift the cost to another agency.").

2. Objective component

To fulfill the objective component, "the alleged deprivation [must be] sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." Hill, 657 F.3d at 122 (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)). The relevant inquiry is whether, given the seriousness of the plaintiff's medical injury, the care provided by the defendant was objectively reasonable. Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006).

Plaintiff alleges that King-Bogle provided unreasonable medical care by failing to prescribe proper pain medication. (See SAC ¶¶ 28, 46-47, 51.) As discussed in the prior subsection, however, the SAC alleges that King-Bogle and other CCS nurses provided continuous care to plaintiff following the February 28, 2012 attack, changing his pain medication no less than three times and with (as plaintiff admits) some success. (See id. ¶¶ 35-38.) It was not unreasonable for

King-Bogle or the other CCS nurses to have waited until an X-Ray confirmed damage to plaintiff's wrist before providing him with stronger pain medications. See Sonds v. Saint Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) ("[P]rison officials and medical officers have wide discretion in treating prisoners, and Section 1983 is not designed to permit federal courts to interfere in the ordinary medical practices of state prisons." (citing Church v. Hegstrom, 416 F.2d 449, 450-451 (2d Cir. 1969))).

With respect to Kelly, plaintiff sufficiently alleges that he received unreasonable medical care following the determination that plaintiff suffered from a fractured wrist. For instance, plaintiff alleges that Kelly and CCS substituted physical therapy (for a broken bone) for surgery despite the determination by an orthopedic specialist that surgery was necessary, and that plaintiff otherwise received little more than pain medication for this ailment in the months leading up to his departure from WCDOC. (See SAC ¶¶ 36, 39-40; Rembert-CCS Opp. at 5.) These allegations, accepted as true, are sufficient to allege the objective component of a § 1983 claim for deliberate indifference in violation of the Fourteenth Amendment. See Chance, 143 F.3d at 703; Jones, 557 F. Supp. 2d at 414-15. Whether these allegations are supported by the facts is a matter for summary judgment or trial that may not be resolved at the pleading stage.

C. Retaliation for Filing Grievances

Plaintiff alleges a First Amendment retaliation claim against WCDOC Defendants Salterelli, Delgado, and Gleason for their actions in response to the

grievances he filed or attempted to file concerning the attack by Bridle and his subsequent medical care. (See SAC ¶ 48; Rembert-WCDOC Opp. at 11-12.) This claim similarly fails.

In order to state a § 1983 claim for First Amendment retaliation, a prisoner must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." See Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citation omitted). "[C]ourts must approach prisoner claims of retaliation with skepticism and particular care." Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002).

"Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003) (internal quotation marks omitted) (quoting Dawes, 239 F.3d at 493). "Otherwise, the retaliatory act is simple de minimis and therefore outside the ambit of constitutional protection." Davis, 320 F.3d at 353 (internal quotation marks omitted) (quoting Dawes, F.3d at 493). Accordingly, "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more . . . than average citizens, before a retaliatory action taken against them is considered adverse." Davis, 320 F.3d at 353 (internal quotation marks and citations omitted).

Though the filing of grievances constitutes protected speech, see Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), the SAC fails to allege any adverse action by any defendants that was causally connected to the filing of such grievances. To the extent plaintiff alleges that an unidentified correction officer "intimidated" him in connection with his December 17, 2012 grievance (see SAC ¶¶ 39, 48), these kinds of non-specific verbal threats are insufficient to allege adverse action. See Dawes, 239 F.3d at 492; Matteo v. Fischer, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) (citing cases). To the extent plaintiff alleges that defendant Delgado, defendant Salterelli, or another unknown correction officer retaliated against plaintiff by failing to process his grievances (see SAC ¶¶ 18-19, 48), such conduct does not rise to the level of a constitutional violation. See Matteo, 682 F. Supp. 2d at 434 n.3 (citing cases).

With respect to defendant Gleason, plaintiff alleges that he forged plaintiff's signature on the second page of his December 17, 2012 grievance (which waived his right to appeal) after he was transferred out of WCDOC custody, in retaliation for the prior grievances he filed. (See SAC ¶¶ 20, 48.) Even assuming plaintiff's signature was forged, plaintiff's allegation that it was Gleason who forged it is entirely conclusory and entitled to no deference. See Iqbal, 556 U.S. at 678. In any event, plaintiff does not allege that he suffered any adverse action as a result of purported forgery; rather, he was transferred out of WCDOC custody at the end of December 2012, before he alleges his signature on the December 17, 2012 grievance

was forged. Accordingly, plaintiff's § 1983 claim for First Amendment retaliation against the WCDOC Defendants fails.

D. Municipal Liability

Finally, plaintiff alleges liability by Westchester County and CCS for the alleged violations of the Fourteenth and First Amendments described above. (See SAC ¶¶ 44, 46, 49-51.) To make out a colorable municipal liability claim, plaintiff must plead that "(1) an official policy or custom [] (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks and citation omitted); see Monell v. Department of Social Servs., 436 U.S. 658, 694 (1978).

With respect to Westchester County, these claims fail because the SAC does not allege an underlying constitutional violation for the reasons discussed supra. See, e.g., Bolden v. Cnty. of Sullivan, No. 11-CV-4337, 2013 WL 1859231, at *2 (2d Cir. May 6, 2013). Even if plaintiff had alleged an underlying constitutional violation, however, plaintiff also fails to plead facts tending to show that a particular official policy or custom contributed to the deprivation of his rights. At most, plaintiff alleges a handful of isolated, unconnected incidents involving various correction officers. See DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.") (internal quotation marks and citation omitted). The SAC thus fails to state a claim for municipal liability under § 1983 against Westchester County.

With respect to CCS, plaintiff's claims do not fail as a matter of law at the pleading stage. Plaintiff alleges an underlying constitutional violation (Fourteenth Amendment deliberate indifference based on the medical treatment he received after it was determined that he suffered from a fractured wrist) for the reasons discussed supra. Further, "the policy requirement [is] satisfied where . . . federal law has been violated by an act of [a] policymaker . . . ." Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 417-18 (1997) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81 (1986)). A "policymaker" is an official "who possesses final authority to establish municipal policy." Walker v. City of New York, 974 F.2d 293, 296 (2d Cir. 1992). The determination of whether a particular person is a "policymaker" is based on the applicable law that organizes the hierarchy of the municipality or organization in question. See id. Here, plaintiff alleges that Kelly was "Director of Nursing for (CCS)" when Kelly prescribed physical therapy instead of surgery. (See SAC ¶ 14, 36, 40, 41, Ex. B.) Plaintiff's description of Kelly's position in CCS, accepted as true and liberally construed for purposes of this pro se complaint, is sufficient to allege that Kelly possessed final authority at CCS to decide what medical treatment plaintiff received and, thus, was a "policymaker" for CCS. See Walker, 974 F.2d at 296. As a result, plaintiff sufficiently alleges § 1983 liability against CCS for Kelly's alleged Fourteenth Amendment violation.[13]

[13] That the SAC alleges Kelly only took one affirmative act in violation of the Fourteenth Amendment, as opposed to repeated actions to evince a widespread policy, is of no moment. See Brown, 520 U.S. at 418 ("In this situation . . . [a policymaker's] first or only action will suffice to ground municipal liability simply because it is the very policymaker who is acting.").

IV. CONCLUSION

For the reasons set forth above, the WCDOC Defendants' motion to dismiss is GRANTED and the CCS Defendants' motion to dismiss is GRANTED in part and DENIED in part.

The Court will issue a separate order scheduling an initial pretrial conference in this action.

The Clerk of Court is directed to close the motions at ECF Nos. 48 and 85.

SO ORDERED.

Dated: New York, New York
July 9, 2014

K. B. Forrest
KATHERINE B. FORREST
United States District Judge

Copy to:

Paul Rembert
12A5754
Attica Correctional Facility
P.O. Box 149
Attica, NY 14011-0149